HAWLEY *against* MANCIUS and others.

In *May*, 1817, *A.* confessed a judgment for 30,000 dollars, in favour of *M.*, *S.* and *C.*, by way of security and indemnity, as well for existing debts as future responsibilities. Afterwards, in *June*, 1817, *A.* being in failing circumstances, assigned certain real and personal estates, specified in schedules annexed to the deed of assignment, to *M.* and *C.*, in trust, to convert the same into money; and after deducting charges and expenses, to pay, 1st. the debts and responsibilities specified in a schedule, (and which included a large sum due to *M.*, *S.* and *C.*,) either rateably, or in such order of preference and priority, as they should deem best : 2d. to pay all the other debts of *A.* : and 3d. to account for the surplus to *A.*, or his legal representatives ; and the real estate assigned, was declared to be subject to the judgment confessed in favour of *M.*, *S.* and *C.*, and to another judgment, in favour of *Q.*—*M.* and *C.* accepted the trust, and executed it by satisfying the greater part of the debts and responsibilities specified in the schedule. In *August*, 1817, some of the creditors of *A.* recovered judgments against him, and in *June*, 1818, issued executions, by virtue of which the Sheriff sold a house and lot of land, which *A.* had conveyed to *M.* and *C.*, a few days previous to his assignment, in trust for the wife of *A.* and her children, and which was not included in the assignment. *H.* became the purchaser at the Sheriff's sale, in trust for those execution creditors ; and in an action of ejectment, in which *M.* and *C.*, and the wife and children of *A.*, were parties, the deed of trust was adjudged to be void as against the creditors for whom *H.* purchased. On a bill filed by *H.* against *M.*, *S.* and *C.*, to enjoin them from selling the same property under their execution, or under the judgment of *Q.*, which *M.* had purchased for a small sum, as a trustee : *Held*, that *M.* and *S.*, by accepting the trust under the assignment, had waived any remedy for their own demands, or those of *M.*, *S.* and *C.*, under their judgment ; the lien of which was preserved, merely for the sake of priority, and to guard against intervening liens ; and as to any direct remedy, the judgment was, in equity, extinguished by the operation of the deed of assignment ; and that *M.* must be considered as purchasing the judgment in favour of *Q.*, in his character of trustee, and could not, therefore, make use of it for any purpose incompatible with that character.

THREE several judgments were recovered on suits at law, in *August*, 1817, by different sets of creditors, against *John C. Cuyler*, for debts accrued before the 22d of *February*, 1817, and the sum total of the judgments amounted to 3837 dollars and 94 cents. Upon execution issued upon one of the judgments, a house and lot of land, in the town of *Watervliet*, in *Albany* county, were sold, on the 29th of *June*, 1818, and purchased in for a nominal sum by the plaintiff, in trust for the said judgment creditors.

*Cuyler*, on the 22d of *May*, 1817, voluntarily confessed a judgment in favour of the defendants, *Mancius, D. Schuyler*, and *Jacob C. Cuyler*, for 80,000 dollars, by way of security and indemnity ; and those defendants, at the same time, executed under their hands and seals, a declaration of trust, stating that the judgment was to sta⸗d as a security for whatever sums of money *Cuyler* then owed them, or either of them, with interest, and for money they, or either of them, might loan to him, and for the payment of all indorsements which either of them had, or should make for him ; and against all damages, costs and charges which either of them might sustain, by means of such indorsements. The judgment was entered up on that day.

Afterwards, on the 25th of *June*, 1817, *Cuyler*, being in failing circumstances, assigned certain real estates, specified in schedule No. 1. annexed to the assignment, (but not the house and lot aforesaid,) and also the personal estate specified in schedule No. 2., to the defendants, *Mancius* and *Jacob C. Cuyler*, upon trust, to convert the real and personal estate into cash, by sales, and after deducting charges and expenses, to pay, (1.) the debts specified in schedule No. 3., either rateably, or in such order of preference and priority as they should deem best (2.) to pay all other debts of *Cuyler*, in like manner : (3.) to account for the surplus to him, or his representatives.

The schedule No. 1. stated, that all the real estate therein specified, was subject to a judgment in favour of the corporation of *Albany* ; a judgment in favour of *Henry*

1823.

HAWLEY
v.
MANCIUS.

*Quilhot;* and to the judgment in favour of *Man-cius, Schuyler*, and *Jacob C. Cuyler ;* and the assignment of the real estate was declared to be made subject to those judgments.

The schedule No. 3., annexed to the assignment, included debts and responsibilities of the three original defendants, in whose favour the judgment was confessed, to the amount of 23,587 dollars ; and two of these defendants, *Mancius* and *Schuyler*, stated in their answer, that they had some remaining demands covered by the judgment, and not included in the specified debts in schedule No. 3., to the amount of 2194 dollars.

*Manicus* and *Jacob C. Cuyler* accepted the trust, and assumed the control of the assigned premises, and satisfied a very great proportion of the debts and responsibilities specified in the schedule No. 3. ; and they assured *Schuyler*, their co-creditor, that they would be enabled, by sales under the assignment, to raise money to pay his debt and responsibilities. The debts in schedule No. 3. amounted to 43,408 dollars; and it was admitted in the answer, that they had all been paid, except 17,372 dollars, and in that sum was included a bond and mortgage to *Moses Rogers*, upon the mansion house, being 10,500 dollars of principal, besides interest, and which was not due until the 22d of *July*, 1819, and was amply secured by that mortgage, leaving only a balance of about 6,000 dollars to be paid, exclusive of *Rogers'* mortgage debt and interest.

*Mancius*, on the 8th of *November*, 1817, purchased in, with his own moneys, the judgment of *Quilhot*, for 350 dollars ; and the defendants, *Mancius, Schuyler* and *Jacob C. Cuyler,* were endeavouring to collect, by execution against the property purchased by the plaintiff, and which was not included in the assignment, a balance of 5000 dollars, claimed to be due and unpaid upon the judgment so confessed for their indemnity. And *Mancius* was also endeavouring to collect, by execution upon *Quilhot's* judg-

ment against the same property, the amount for which it was bought in by him

The assignees could not estimate the value of the real estate assigned to them in trust, but the nominal value of the personal estate assigned to them was 32,174 dollars, and the debts of *Cuyler*, not mentioned in the schedule No. 3., and which were to be postponed until those in schedule No. 3. were satisfied, were 37,698 dollars.

The land claimed by the plaintiff had been purchased by *Cuyler*, on the 22d of *February*, 1817; and on the 19th of *June*, 1817, he conveyed it to the defendants, *Mancius* and *Jacob C. Cuyler*, in trust, to account for the rents and profits to his wife during her life, and to stand seized in fee to the use of her heirs after her death. After this land had been purchased by the plaintiff, on execution against *Cuyler*, as above stated, he brought an ejectment to recover possession, in which suit the trustees for the wife and children of *Cuyler*, were made defendants, and claimed title under that trust deed. A verdict was taken for the plaintiff, subject to the opinion of the Supreme Court, upon the validity of the trust deed; and after solemn argument, the Court adjudged, in *October* term, 1819, the trust deed fraudulent and void, as against the judgment creditors, for whom the plaintiff had purchased the land on execution.

The original bill was filed against the defendants, *Mancius*, *Schuyler*, and *Jacob C. Cuyler*, to enjoin them from selling the same land, under the judgment so confessed to them, and under the judgment of *Quilhot*, so assigned to *Mancius*. The defendants, *Mancius* and *Schuyler*, answered, and the defendant, *Jacob C. Cuyler*, suffered the bill to be taken *pro confesso*. *Schuyler* having died, pending the suit, and also *Cuyler* and his wife, the suit was renewed, by a supplemental bill, against the administratrix of *Schuyler*, and against the heirs of *Cuyler* and his wife, who appeared and answered; and the cause was brought to a hearing on the bills and answers.

*A. Van Vechten*, for the plaintiff, contended, as the grounds on which the injunction was asked and granted, that it was inequitable for the defendants to enforce their judgment, confessed by *John C. C.*, against the property in the *German Flatts*, conveyed in trust for the use of his wife. That judgment was confessed specifically to cover their respective demands against *John C. C.*, including existing and future responsibilities, and was a lien upon all the defendant's estate, as to such debts and responsibilities. *John C. C.* having made a general assignment to *Jacob C.* and *M.* subsequent to the judgment, the lien of that judgment is, in terms, recognised, and, according to the answer, was intended to be preserved ; and, of course, the judgment should have been first satisfied out of the funds assigned : and that such was the understanding of the defendants was apparent, from their omitting to enforce the judgment, and proceeding under the assignment. By accepting the assignment, subject to the judgment, the assigned funds became chargeable with the payment of the judgment, and the right to enforce it was, therefore, waived, except for the purpose of excluding intermediate liens upon the assigned property, between the date of the judgment and that of the assignment ; but the property on the *German Flatts*, in trust for the wife, was not included in the assignment, and was not, therefore, to be touched by the judgment. The assignees have, in fact, so treated it ; since they have satisfied about four fifths of the debts and responsibilities covered by the judgment out of the assigned funds, and permitted the *Flatts* property to be sold, under the execution in favour of the plaintiff's *cestui que trusts*, without interposing any other claim than that derived under the trust deed to *M.* and *Jacob C. C.*, in favour of Mrs. *C.* and her children, which had been adjudged void by the Supreme Court.

The *Quilhot* judgment, as to the consideration of 350 dollars paid for it by *M.*, cannot equitably be enforced

against the *Flatts* property; because it is recognised in the assignment as a subsisting lien, and the assigned fund is amply sufficient to satisfy it; and *M.* having the funds in his hands, equity will not permit him to enforce the judgment against other property, so as to defeat vigilant *bona fide* creditors. At all events, if the *Flatts* property is liable at all, it can be for no more than a contributory proportion of what may remain to be collected on the judgment.

From the answer, it appears that the assignees have funds in hand more than sufficient to satisfy any moneys claimed to be unpaid of the debts covered by their judgment in favour of *M., S.* and *J. C.* and the *Quilhot* judgment. All the debts, to which a preference is given by the assignment, are specified in schedule No. 3.; and, from the payments stated in the answer of the assignees, it appears that several payments have been made which are not provided for or authorized by the specification in the schedule.

Under the circumstances of this case, the attempt to set up and enforce the judgment of *M., J. C.*, and *S.*, and of *Quilhot* against the *Flatts* property, is, in judgment of law, an attempt to delay, hinder, and defeat creditors, so far as concerns the plaintiff.

The trust deed of the *Flatts* property cannot be brought in question between these parties, as the relief sought against them, and their defence founded on the judgment of *M., S.* and *J. C.*, are equally hostile to that deed; and the heirs of Mrs. *C.*, as *cestui que trusts*, have no interest in that judgment.

The mortgage of *Rogers* on the mansion-house, can have no priority as to the judgment of *M., S.* and *J. C.*, as the latter is a general, and the former a particular lien; and it appears by the answer, that the assignees had received enough to satisfy their judgment, before the mortgage fell due.

The power in the assignment to give preference, in the

1823.

HAWLEY
v.
MANCIUS.

order and manner of making payments, cannot aid the as-signees, as the priority of their judgment was not impaired by that power. *M.*, *S.* and *J. C.* cannot, therefore, be permitted to use that power to the prejudice of the plaintiff, by keeping their judgment on foot, while they have funds to satisfy it, for the purpose of defeating the just debts of the plaintiff's *cestui que trusts.* He cited 3 *Johns. Ch. Rep.* 378. 4 *Johns. Ch. Rep.* 217. 444. 446. 5 *Johns. Ch. Rep.* 236. 1 *Ch. Cas.* 99. 2 *Ves.* 18. *Amb.* 121. 2 *Eq. Cas. Abr.* 715. *pl.* 3. *Cas. temp. Talbot*, 69. *Prec. in Ch.* 22. 101. 425. 1 *Atk.* 188. 2 *Atk.* 77. 420. 2 *Lev.* 70. 146. *Newland on Contracts*, 122—133. 2 *P. Wms.* 638. 202. 2 *Ves.* 591. 3 *Ves.* 617. 1 *P. Wms.* 458. 1 *Atk.* 280. 3 *Atk.* 20.

*Henry*, for the defendants, *Mancius*, and *Margaret Schuyler*, administratrix of *David Schuyler*, contended, 1. That the judgment in ejectment in the Supreme Court, was not conclusive against the validity of the conveyance of *June* 19, 1817, from *John C. C.* to *M.* and *Jacob C. C.* of the property in question, in trust for the wife of the grantor and her children. (*Running. Eject.* 95. 1 *Johns. Cas.* 502. 2 *Comyn's Dig.* tit. *Chancery*, 283. *L.*) It was a conveyance to the wife, of a portion of her inheritance, in trust for her and her children; and the settlement was much inferior to what she would have been entitled to by descent. There is a great difference in such cases between coming to this Court for aid, and coming here for the purpose of breaking up a settlement. (*Prec. in Ch.* 22. 2 *Eq. Cas. Abr* 51. 478. 1 *Atk.* 188. 190. *Cas. temp. Talbot*, 64. 2 *Ves.* 16. 18. 308. *Amb.* 121. *Cro. Jac.* 158. 2 *Atk.* 519. 6 *East*, 257. 271. 273. notes. *Prec. in Ch.* 101. 527. 10 *Ves.* 139. 151. *Bingham on Covert.* 4.) Here was a conveyance after marriage, for a full and adequate consideration, in trust. (*Reade* v. *Livingston*, 3 *Johns. Ch. Rep.* 481. *Atherly Family Settl* 161,

162. 165—177. 2 *Lev.* 148.) 2. But if that conveyance should be deemed inoperative, yet the judgment of the 22d of *May*, 1817, confessed and entered up in good faith, is an effectual and subsisting security for all the purposes expressed in the declaratory instrument of the same date. This judgment is a lien on the estate in question, and the execution upon it cannot be impeached, for it has been issued for debts and responsibilities within the terms of the declaratory instrument, and for debts not disputed by the plaintiff. (2 *Johns. Ch. Rep.* 303. 5 *Johns. Ch. Rep.* 320.) It never was the intention that this lien should be narrowed. This Court will never marshal assets, so as to assist a particular creditor, at the expense of the general creditor; and not, in this case, at the expense of a preferred creditor. It would be breaking in upon the principle of equality of distribution, and of marshalling funds. (8 *Ves.* 386, 387. 3 *Johns. Ch. Rep.* 412. 4 *Atk.* 446. 1 *Vern.* 455. 10 *Mod.* 487, 488.) The Court will not suffer a party to come here to disturb the equality of distribution. (1 *Fonbl. Equ.* 310, 311. 313. *part* 1. *ch.* 2. *s.* 25. n. *e.*) The debts of the postponed creditors exceed 30,000 dollars; and if a contribution is enforced here, as the plaintiff wishes, it would subvert the equality of right between the creditors.

*Quilhot's* judgment is an indispensable lien upon the estate of *John C. C.*, and the sum paid by *M.* for the assignment of it, may be lawfully levied on the estate in question. The plaintiff, under the circumstances of this case, has no right to the aid of this Court to confirm his title acquired at the sheriff's sale, or to throw any of the claims, either of *M.* or of the defendant, Mrs. *Schuyler*, upon the trust fund of the creditors of *John C. C.*, or to oblige these defendants, in any way, to resort to that fund. The trustees have not received enough to pay the preferred debts. The defendant, *M.*, is vindicating the trust here according to his duty. If it is established, it puts an end to all the liens.

1823.

HAWLEY
v.
MANCIUS.

THE CHANCELLOR. The question on the validity of the deed, in trust, for the benefit of the wife and children of *John C Cuyler*, has been brought incidentally into discussion, though it does not seem properly to arise in the case. The only real point is, whether *Mancius* and *Cuyler*, as surviving owners at law of the judgment of the 22d of *May*, 1817, and *Mancius*, as assignee of *Quilhot's* judgment, are entitled, under the facts in the case, to enforce these judgments, or either of them, against the lands purchased by the plaintiff.

With respect to the trust deed in favour of Mrs. *Cuyler*, it is sufficient to refer to the judgment of the Supreme Court upon the question which was raised and discussed, touching the validity of that deed. So long as that judgment remains in force, it is conclusive against the deed. A judgment of a Court of competent jurisdiction, cannot be questioned or impeached, collaterally, in another Court, in an action between the same parties, and upon a point once put directly in issue and decided. This Court cannot examine into the intrinsic merits of a judgment at law, without the aid of new and distinct matter, showing fraud in procuring it, or that it is used or retained against conscience. This is a plain and well settled principle; and the deed in favour of the wife and children having been solemnly adjudged at law to be fraudulent and void, as against creditors, it must be taken and held to be equally so in this Court. I shall, therefore, place this deed entirely out of view, in the consideration of this case.

*A judgment of a Court of competent jurisdiction, cannot be impeached collaterally in another Court.*

*Where a deed is adjudged fraudulent and void by a Court of law, it will be held void by this Court.*

*Mancius* and *Jacob C. Cuyler* having accepted the trust created by the assignment of the 25th of *June*, 1817, it became their duty to convert the real and personal estate into money, and to pay *Cuyler's* debts, according to the priorities created by law and by the deed. The real estate was assigned subject to the judgments, and they were entitled to priority of payment out of the proceeds of the real estate. It was the intention of all the parties to the deed

of assignment, that the judgment creditors, as well as the other creditors, should be paid out of the property assigned. None of them thought of paying any of the judgments out of the land purchased by the plaintiff; for, until *October*, 1819, that land was considered by *Cuyler*, and by his assignees, to belong to them, in trust, for his wife and children. The assignment was intended as a provision for all the debts, to the extent of the funds; and, as the real as well as personal estate was directed to be sold and converted into cash, it was intended, undoubtedly, that the first proceeds should be applied, as they were bound in law to be applied, to discharge the judgments, and then that the joint fund, arising from the real and personal estate, should be applied to the debts in schedule No. 3. remaining unsatisfied. If this intention had been strictly executed, both the judgments now directed against the lands of the plaintiff would have been satisfied; and it is apparent, from the answers, that the proceeds of the real and personal estate, received by the assignees, were amply sufficient for the satisfaction of the judgments. The assignees acted according to the declared intention of the assignment, and actually discharged a great part of the judgment which they themselves held; and if they have not actually discharged the whole of it, it has been owing to their own voluntary act or neglect.

The schedule No. 3., annexed to the assignment, contained a list of debts to be first paid, and nearly all the debts and responsibilities covered by the judgment of *Mancius* and others, were included in that list. The remaining demands covered by the judgment, and not included among the specified debts in that schedule, are stated in the answer of *Mancius* and *Schuyler*, to amount to 2194 dollars. But whether these demands were in the schedule or not, is immaterial; they were to be first paid, as part of the judgment, out of the proceeds of the real estate, and the residue of the judgment, (if any,) unsatisfied out of the real estate,

If two funds are specifically bound for one debt, and one of the funds only bound for another debt, that other debt has a preference on the only fund to which it is entitled to resort.

was to be first paid, as part of the schedule No. 3. If any part of the judgment was entitled to be *first* and *preferably* paid, out of the proceeds of the real estate, it was these very demands, or portion of the judgment not included in the schedule No. 3. ; and upon this principle, that if there be two funds specifically bound for one debt, and only one of the funds specifically bound for another debt, that other debt shall have a preference upon the only fund to which it is equally entitled to resort.

The debts specified in schedule No. 3. amounted to 43,408 dollars ; and it was admitted in the answers, that they had all been paid, except 17,372 dollars. In that sum is included the bond and mortgage of *Moses Rogers*, upon the mansion house, amounting to 10,000 dollars principal, and 700 dollars interest; which principal was not due and payable until the 22d of *July*, 1819, or upwards of two years after the date of the assignment, and which debt we may presume to be amply secured by the mortgage. That mortgage debt cannot be permitted to encroach upon the fund to be applied under the assignment to the discharge of the debts in schedule No. 3., until the other debts contained in that schedule are satisfied, or, at least, until *Rogers* has resorted to and exhausted his mortgage fund ; and this restriction upon the mortgage of *Rogers*, falls within the influence of the principle, which has just been mentioned. There would remain, then, exclusive of that mortgage debt, only about 6000 dollars of the debts in schedule No. 3. to be satisfied ; and the admissions in the answer conclusively show, that the assignees have received funds and property sufficient for the purpose; and if any part of those funds has been diverted to other purposes, instead of being applied to the discharge of the judgments and the other debts in schedule No. 3., the assignees have done it in their own wrong.

I consider it to be a very clear point, that *Mancius* and *Jacob C. Cuyler*, by the acceptance of the trust, and carry-

ing it into execution in a great degree, even with respect to their own demands and those of *Schuyler*, covered by the judgment, have waived their remedy under the judgment, and accepted of the provision in the assignment in lieu of it. It would be impossible to maintain that they could use the judgment in destruction of the trust; and if they could use it at all, it would be to derange the order and efficacy of the trust provisions; they are, therefore, upon every sound principle of justice and equity, restricted to the remedies placed in their hands by the assignment. The lien of the judgment is preserved by the terms of the assignment; but it is only for the sake of priority in payment, and to guard against the intrusion of intervening liens. They must sell, and pay, and distribute, in the character of trustees, and not of judgment creditors; and to take out an execution upon the judgment against property over which they are exercising a discretion and control as trustees, would be incompatible with a due discharge of the trust, and a manifest breach of it. They are bound, therefore, to seek for satisfaction of their judgment in the mode presented by the terms of the trust which they have accepted. They have all along so thought and acted, until after the judgment at law upon the deed of settlement. The answer states, that they assured *Schuyler*, their co-creditor, that they would be enabled, by sales under the assignment, to raise money to pay his demand, and discharge his responsibilities.

As *Mancius* and *Jacob C. Cuyler*, by means of their acceptance of the trust, have disabled themselves from proceeding on the judgment, *Schuyler*, their partner in that judgment, is equally concluded by their acts, and he could not use the judgment to the disturbance or destruction of the trust. He was entitled to look to them for his payment and indemnity, for they had a control over the judgment as parties to it, and could modify, restrict, or discharge it. By the death of *Schuyler*, they, as

survivors, have the exclusive control of the judgment at law; and the remedy of his representatives is here, in this Court, to compel them to account for the due use and proceeds of the judgment. They cannot be permitted to use it inconsistently with the terms of the trust, for the benefit of *Schuyler's* representatives, any more than for their own benefit; and if the estate of *Schuyler* has sustained any injury by the acts of his associates, *Mancius* and *Jacob C. Cuyler*, the indemnity is to be sought from them. I am entirely satisfied, that any direct remedy upon the judgment, for any part of the demands intended to be covered by it, is in equity extinguished by the acceptance and operation of the deed of assignment.

There is no reason arising, on this case, which appears to be sufficient to deprive the plaintiff of the protection and assistance of this Court, against the undue application and use of the judgment of *Mancius.* The plaintiff represents judgment creditors, who have acquired a priority and advantage fairly in a course of legal diligence; and if the amount of their judgments was an inadequate price for the lands purchased by their trustee, they were not responsible for the fall of the market price of the land. It was the act of these trustees, *M.* and *C.*, that depreciated this property. They had very essentially contributed to render the title to it shaded, doubtful, and litigious, by their acceptance and assertion of the deed of settlement. It may well be assumed, that those creditors, under all the circumstances, gave a reasonable price for the land, when they took it to secure their judgments, amounting to near 4000 dollars. The facts in the case evidently show, that it is the only satisfaction they are to receive; and when they purchased, the title was no doubt deemed extremely hazardous. There is nothing, then, in the case, to impair the pretension of the plaintiff to the ordinary aid and protection of the Court. He does not come here to ask for any particular favour or preference. His preference and

his title have been already duly acquired at law. Nor does he come here to interfere with the distribution of the fund under the deed of assignment, or to impair the rights of the general creditors upon that fund. He comes simply to be protected against the inequitable use of their judgment, by *M.* and *C.*, contrary to the deed of assignment, and to their duties as trustees under it. That assignment was made on purpose to give preferences, and to disturb all equality of distribution of the funds of *Cuyler.* The scheduled debts were to be first paid, and that too in such order of preference and priority, as the trustees should deem proper, by which means they had the complete disposition of the whole fund, and the power to apply it, in the first place, exclusively to the satisfaction of their entire demands. The assignment, with all its provisions, was in hostility to the equitable doctrine of an equal or rateable distribution of assets; and the case affords a melancholy assurance, that the postponed creditors, whose debts are not in schedule No. 3., and which exceed 37,000 dollars, will not receive a single cent. If a surplus should remain for those general creditors who do not belong to the privileged class, (and the plaintiff's *cestui que trusts* were of that description,) the trustees have the same discretion given to them, especially by the deed, of giving preferences and priorities.

If the defendants were permitted to go on and collect 5000 dollars, under their judgment, out of the lands purchased by the plaintiff, how would this promote the marshalling of assets, or equality of distribution? Not at all. It would probably cut off the judgment creditors whom the plaintiff represents, from their debts, as it is hardly to be presumed that they would be willing to redeem the land from such an incumbrance, in addition to the other judgment of *Quilhot.* It might enlarge the chance of a surplus of funds after the scheduled debts were satisfied; but who can tell that there would be any equality of dis-

tribution of that surplus? or that those *cestui que trusts* would be allowed to touch a cent of it? for the trustees have the same power given to them that *Cuyler* had, to prefer one creditor to another. The interference of the Court in this case will not, therefore, in any degree impair the operation of its favourite doctrine of equality in the distribution of trust funds; and it strikes me, that the Court is called upon, by very obvious principles of justice and equity, to restrain the defendants, *M.* and *C.*, from renouncing the duties of their trust, by resorting, not as trustees, but as judgment creditors, to their judgment, to collect a portion of their debt, especially, when that act will deprive the plaintiff of a title fairly and justly acquired by law.

Upon the first consideration of this case, I thought a distinction might be taken between *Quilhot's* judgment and the other; but upon more reflection, I think there is no just ground for it. *Mancius* purchased that judgment while in the execution of his trust; and if he did not buy it in for the benefit of the estate, (as we must presume he did, since it was his duty, as trustee, to have paid it in preference to any other debt, as it was the oldest lien,) he bought it upon some speculation of his own, at a reduced price; and any such advantage he could not be permitted to retain, as it would be incompatible with the duties of his trust.   He has, therefore, in his answer, very properly renounced all claim to any demand under it, beyond a reimbursement of the purchase money, with interest.   This very renunciation is an admission of the purchase in the character of trustee, and not on his own account, and he was entitled to reimburse himself out of the earliest fund in hand.   The judgment, to the extent of the purchase money paid, had the preference to any demand, and why did he not reimburse himself instantly?   If he did not, it was his own negligence, for he was entitled to do it, and had the means for that purpose.   Can he now, under the circumstan-

ces in which he purchased this judgment, and impliedly admits that he holds it, be permitted to depart from his character of trustee, and act as a stranger to the trust, and as *Quilhot* himself might have acted, and collect the judgment at law upon any lands chargeable with it ? Certainly not. He purchased in the judgment, while he was acting as trustee, and it must be satisfied to the extent of the purchase money paid, out of the trust funds, and not otherwise.

I shall accordingly decree, that the injunction heretofore issued be continued, and made perpetual, in respect to the judgment confessed in favour of *Mancius* and others, and in respect to the judgment of *Quilhot*, and in respect to any proceedings under them, or either of them, by execution, scire facias, action of debt, or otherwise, so far, at least, as concerns the lands purchased and claimed by the plaintiff, and that no costs be charged by either party against the other.